FILED
IN CLERKS OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 29 2019 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

S. SHARPE SULAYMU-BEY, ALEISHA M.
SULAYMU-BEY,

                          Plaintiffs,

      -against-

CITY OF NEW YORK; GLADYS CARRION,
individually and in her capacity as Commissioner
of ACS/NYCCS; SASHA DAWSON, individually and
in her capacity as employee of ACS/NYCCS; KATHY
ANN BEST, individually and in her capacity as employee
of ACS/NYCCS; LINDA CATO, individually and in
her capacity as employee of ACS/NYCCS; NIKIA
WILLIAMS, individually and in her capacity as employee
of ACS/NYCCS; MICHAELANGELO MEDINA;
DETECTIVE DAVID SMALL, OFFICER TERRY
RILEY, and SERGEANT CHARLES PIEFER,
individually and in their capacities as employees of New
York City Police Dept.; LUCIANA MICHEL,
individually and as physician; KINGS COUNTY
HOSPITAL; and HEALTH AND HOSPITALS
CORPORATION,

                          Defendants.

-----------------------------------------------------------------------X

**MEMORANDUM & ORDER**
17-cv-3563 (AMD) (SJB)

**ANN M. DONNELLY, United States District Judge:**

      The *pro se* plaintiffs bring this § 1983 action against multiple defendants: City of New

York, Gladys Carrion, Sasha Dawson, Kathy Ann Best, Linda Cato, Nikia Williams,

Michaelangelo Medina, Detective David Small, Officer Terry Riley, Sergeant Charles Piefer,

Luciana Michel, Kings County Hospital, and Health and Hospitals Corporation. The plaintiffs

allege that the defendants violated their rights when the New York City Administration for

Children's Services ("ACS") removed the plaintiff's children, and instituted Family Court

proceedings. The parties filed cross-motions for judgment on the pleadings. For the reasons

1

below, the plaintiffs' motion is denied, and the defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

On April 25, 2014, ACS removed the plaintiffs' four daughters from their parents' custody without prior court authorization based on reports of neglect. Following proceedings in New York Family Court, the plaintiffs regained custody of three of the children in October of 2014, and the youngest child was returned in January of 2015.

### I. Medical Examination and Child Neglect Report

On April 24, 2014, plaintiff Aleshia Sulaymu-Bey took her four daughters, N.A.S.B., M.S.S.B., A.S.S.B., and N.S.B., to the pediatric division of Kings County Hospital for medical check-ups. (ECF No. 32 ¶ 32.) The check-ups included a follow-up appointment for the plaintiffs' oldest daughter, N.A.S.B, who had fallen in a grocery store a couple of weeks earlier. (*Id.* ¶ 33.) Dr. Kisung Kim, a resident physician, examined the plaintiffs' youngest daughter, N.S.B., who was about a year old at the time. (*Id.* ¶ 35; *see also* ECF No. 35-11 at 3-4.) Dr. Kim told Ms. Sulaymu-Bey that N.S.B. was healthy, a conclusion reflected in medical records he prepared—NSB was "healthy, developed, and nourished." (ECF No. 32 ¶ 36.) The attending physician, defendant Dr. Luciana Michel, arrived shortly thereafter. (*Id.* ¶ 37.) Dr. Michel did not examine N.S.B., but asked Ms. Sulaymu-Bey whether she was giving N.S.B. the medicine that had been prescribed for her; Ms. Sulaymu-Bey responded that she used "alternative medicine," including herbs, because of her religious beliefs and citizenship in the "Moorish

---

[1] The facts are derived from the plaintiffs' complaint and the Family Court orders and hearing transcripts. I take judicial notice of the transcripts not for the truth of the matters asserted at the hearings, but "to establish the fact of such litigation and confirm the contents of those hearings." *Green ex rel. T.C. v. Mattingly*, No. 07-CV-1790, 2010 WL 3824119, at *1 (E.D.N.Y. Sept. 23, 2010) (internal quotation marks and citation omitted).

Nation." (*Id.* ¶¶ 5, 37-38; *see also* ECF No. 35-11 at 3-4.) Dr. Michel thought that N.S.B. was underweight; the doctor became "agitated" and yelled at Ms. Sulaymu-Bey.[2] (*Id.* ¶¶ 38, 40.) She scheduled a follow-up appointment for six weeks later, but prescribed no treatment. (*Id.* ¶ 40.) Ms. Sulaymu-Bey asked for a "second opinion" about N.S.B. (*Id.* ¶ 40.) Dr. Michel also concluded that the plaintiffs' oldest daughter, N.A.S.B., had a heart murmur.[3] (*Id.* ¶ 46.)[4]

After Ms. Sulaymu-Bey and her children left the hospital, Dr. Michel filed a report with the Statewide Central Register of Child Abuse and Maltreatment ("SCR Report") about her "failure to thrive" diagnosis of N.S.B.[5] (*Id.* ¶¶ 48-49.)

## II.     ACS's Removal of the Children

The next day, defendants Nakia Williams, Linda Cato, and Kathy-Ann Best—employees of ACS[6] ("ACS defendants")—four New York Police Department officers—defendants Charles Piefer, Michaelangelo Medina, David Small, and Terry Riley ("police defendants")—and two other ACS employees went to the plaintiffs' house to investigate the allegations in the SCR Report.[7] (ECF No. 32 ¶¶ 53, 206.) The plaintiffs would not let them in the house. Ms.

---

[2] The plaintiffs allege that Dr. Michel "coerced" Dr. Kim to alter his findings in order to further her agenda. (ECF No. 32 ¶ 41.)

[3] The plaintiffs assert that the diagnosis was false. (ECF No. 32 ¶ 46.)

[4] At Dr. Michel's behest, Ms. Sulaymu-Bey also saw a social worker, who asked her a few questions and gave her a business card. (ECF No. 32 ¶ 45.)

[5] Health care professionals are required by law to report . . . suspicions" that "a child is being abused or neglected" to the SCR. *Nicholson v. Williams*, 203 F. Supp. 2d 153, 166 (E.D.N.Y. 2002) (citing N.Y. Soc. Serv. Law §§ 413, 414.)

[6] ACS had previously been in contact with the plaintiffs regarding educational neglect petitions related to their daughters' private school education. (ECF No. 32 ¶ 194.)

[7] ACS "is responsible for investigating reports involving children in New York City." *Nicholson*, 203 F. Supp. 2d at 166. "When an ACS field office receives a report from SCR, an applications worker forwards it to a supervisor," and the supervisor "assigns a Caseworker to investigate." *Id.* "ACS is responsible for completing its investigations of complaints referred by SCR within sixty days." *Id.* (citing N.Y. Soc. Serv. Law §§ 424(6), 424(7)). "A Child Protective Manager ("CPM") oversees the Supervisor–Caseworker team and approves major decisions such as removing a child or prosecuting a mother." *Id.* "When the investigation is completed, ACS must determine whether there is 'credible evidence' to support the allegations." *Id.*

Sulaymu-Bey told them that doctors saw N.S.B. the previous day and concluded that N.S.B. was "developed, hydrated, active and nourished." (*Id.* ¶ 53.) Ms. Sulaymu-Bey slid the notice for N.S.B.'s follow-up appointment under the door. (*Id.*) Eventually, one of the officers forced the door open; they took N.S.B. from Ms. Sulaymu-Bey's arms, applying pressure to Ms. Sulaymu-Bey's head and neck. (*Id.* ¶ 57.) They also took the other three children. (*Id.*) The defendants did not have court authorization for the emergency removal, which they conducted pursuant to § 1024 of the Family Court Act. (*Id.* ¶ 122.)

## III. Family Court Petitions and Hearings

Later that day, defendant Gladys Carrion, Commissioner of ACS, filed four Article 10 petitions in Kings County Family Court seeking orders that the plaintiffs' children were "neglected;" Commissioner Carrion asserted that Ms. Sulaymu-Bey "fail[ed] to provide the children . . . with medical care," and "fail[ed] to provide the subject children . . . with proper supervision or guardianship." (ECF Nos. 35-1, 35-2, 35-3, 35-4.) The petitions included Dr. Michel's diagnosis about N.S.B., and her observation that Ms. Sulaymu-Bey did not have "insight" into N.S.B.'s nutritional needs. (*E.g.*, ECF No. 35-1 at 5.) The petitions asserted that the other children had not had medical appointments at Kings County Hospital in about eight months, and that N.A.S.B. had "a heart murmur, which [Ms. Sulaymu-Bey] denied." (*E.g.*, *id.* at 6.) In addition, the petitions included allegations that the plaintiffs' home was "in a cluttered and unsanitary state." (*Id.*) The petitions noted that the Police Department had requested "an immediate psychiatric evaluation" of Ms. Sulaymu-Bey as a result of her "behavior and presentation." (*Id.*)

On the same day, Family Court Judge Robert Mulroy held an *ex parte* hearing.[8] (ECF No. 32 ¶¶ 49, 101.) Judge Mulroy granted the Article 10 petitions; he ordered the temporary removal of the children, which he deemed "necessary to avoid imminent risk to [the] child[ren']s life or health," based on his determination that Ms. Sulaymu-Bey failed to provide the children with adequate medical care, that the plaintiffs' home was "cluttered and unsanitary," and that Ms. Sulaymu-Bey was "being investigated for possible emergency psych eval," and he ordered that the children be placed in the custody of the Commissioner of ACS. (ECF No. 35-6.) Judge Mulroy set a date for a permanency hearing on April 29, 2014. (ECF No. 35-5 at 7.)

The plaintiffs contacted defendant Sasha Dawson, an ACS employee, who told them about the upcoming hearing on April 29th. (ECF No. 32 ¶¶ 62-63.) The plaintiffs appeared at the April 29th hearing, which Judge Mulroy adjourned to the next day to hear the plaintiffs' application pursuant to § 1028 of the Family Court Act for the return of their children. (ECF No. 35-7 at 21.) The plaintiffs argued that as Moorish-Americans, they were not subject to the jurisdiction of the Family Court. (*Id.* at 15.)

After a series of motions and another hearing, Family Court Judge Daniel Turbow held a trial on August 27, September 3, September 10, September 29, and October 10, 2014. (ECF Nos. 35-9, 35-10, 35-11, 35-12, 35-13.) Six witnesses testified for ACS—Dr. Michel, Dr. Kim, Kathy Ann Best, Nikia Williams, Linda Cato, and Z. Najam. (ECF No. 35-9 at 2; ECF No. 35-11 at 2.) Ms. Sulaymu-Bey testified on her own behalf. (ECF No. 35-9 at 2.)

Dr. Michel testified that she reviewed Dr. Kim's examination and discussed her concerns about N.S.B.'s weight with Ms. Sulaymu-Bey. (ECF No. 35-9 at 3, 10-11.) She diagnosed N.S.B. with "failure to thrive" because N.S.B.'s weight had dropped from the 94th percentile at

---

[8] The plaintiffs were not given notice of the hearing. (*See* ECF No. 32 ¶ 61.)

birth to about the 14th percentile at the April 24th examination, which Dr. Michel attributed to "inadequate caloric intake." (ECF No. 35-9 at 5-6, 10.) Dr. Michel further testified that she filed the SCR report because of her diagnosis of failure to thrive, Ms. Sulaymu-Bey's lack of insight into N.S.B.'s condition, and Ms. Sulaymu-Bey's failure to take N.S.B. to medical appointments. (ECF No. 35-11 at 8.)

Judge Turbow asked Dr. Michel about Dr. Kim's medical note that N.S.B. was "nourished and developed." (ECF No. 35-11 at 5.) Dr. Michel explained that it may not be possible to identify "failure to thrive" due to weight loss on a mere physical observation. (*Id.*)

Defendants Williams and Cato testified that they went to the plaintiffs' home on April 25, 2014, to investigate the SCR Report and conduct a home visit. (ECF No. 35-9 at 16.) Ms. Sulaymu-Bey refused to let them in. (*Id.* at 21.) They called the police for "security and support." (*Id.* at 21.) When Ms. Sulaymu-Bey opened the door to her home after two and a half hours, Williams observed that N.S.B., the plaintiffs' youngest daughter, seemed "very pale" and "very small." (*Id.* at 18-19.) Defendant Cato did not think that N.S.B. could "stand up on her own" or "even sit on her own." (*Id.* at 25.)

On October 10, 2014, Judge Turbow dismissed the Article 10 petitions for the three oldest children "due to the agency's failure to prove neglect." (ECF No. 35-15.) Judge Turbow found by a preponderance of the evidence that Ms. Sulaymu-Bey neglected N.S.B. "by reason of acts that caused the child to suffer from failure to thrive," and ordered that N.S.B. not be returned to the plaintiffs. (ECF No. 35-14 at 2.)

On January 13, 2015, Judge Turbow ordered that N.S.B. be released to Mr. Sulaymu-Bey's custody under ACS supervision for one year with certain conditions. (ECF No. 35-16 at 2.)

## LEGAL STANDARDS

A Rule 12(c) motion for judgment on the pleadings applies the same standard as a motion to dismiss under Rule 12(b)(6). *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). In deciding the motion for judgment on the pleadings, the court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiffs'] favor." *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (alteration in original). Submissions filed by a *pro se* litigant are to be "liberally construed," and a *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). Nevertheless, even a *pro se* complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Mcmcuso v. Hynes*, 379 Fed. Appx. 60, 61 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (applying *Iqbal* and *Twombly* to a *pro se* complaint). The court will dismiss the complaint if the plaintiff fails to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The reviewing court "is not limited to the four corners of the complaint," and may also consider "documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Villanueva v. City of New York*, No. 08-CV-8793, 2010 WL 1654162, at *5 (S.D.N.Y. Apr. 14, 2010) (internal quotation marks and alterations omitted); *see also Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002). Thus, I consider the Family Court orders and the hearing transcripts attached

to the parties' briefs in deciding this motion. *Villanueva*, 2010 WL 1654162, at *5. I take

judicial notice of the transcripts "not for the truth of the matters asserted in those proceedings,

but rather to establish the fact of such litigation and confirm the contents of those hearings."

*Green*, 2010 WL 3824119, at *1 (internal quotation marks and citation omitted).

## DISCUSSION

### I.    Defendants' Motion for Judgment on the Pleadings[9]

#### A.    Due Process Claims (Fourteenth Amendment)[10]

The Second Circuit has observed that "parents have a constitutionally protected liberty

interest in the care, custody and management of their children." *Southerland v. City of New

York*, 680 F.3d 127, 142 (2d Cir. 2012) (internal quotation marks and alterations omitted) (citing

*Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir. 1999; *Troxel v. Granville*, 530 U.S. 57, 65-

66 (2000)).  Therefore, the state's removal of a child may give rise to substantive and procedural

due process claims. *See Southerland*, 680 F.3d at 142.  In this context, "a procedural due process

claim challenges the procedure by which a removal is effected, [while] a substantive due process

claim challenges the fact of the removal itself." *See id.* (internal quotation marks and alterations

omitted.)

---

[9] To the extent the plaintiffs raise any claims on behalf of their children, those claims are dismissed. The plaintiffs, who are proceeding *pro se*, can only bring claims on their own behalf. *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990) ("[A] non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child."). In addition, the plaintiffs did not assert any false arrest claims on their children's behalf, so I do not address the defendant's argument in this regard. (*See* ECF No. ¶¶ 228-30.) The defendants did not move to dismiss the false arrest claims that the plaintiffs asserted on their own behalf.

[10] The plaintiffs' Fifth and Ninth Amendment due process claims must be dismissed because "the Fifth Amendment pertains only to the federal government," *Park v. City of New York*, No. 99-CV-2981, 2003 WL 133232, at *7 (S.D.N.Y. Jan. 16, 2003), and "the Ninth Amendment does not independently confer any constitutional rights that may support a § 1983 claim." *Sevilla v. Perez*, No. 15-CV-3528, 2016 WL 5372792, at *10 (E.D.N.Y. Sept. 26, 2016); *see also People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 300 (S.D.N.Y. 2000) (Ninth Amendment "claim does not create a basis for recovery independent of plaintiffs' other claims because 'the Ninth Amendment does not confer substantive rights in addition to those conferred by other provisions of our governing law.'").

### 1. Procedural Due Process

The plaintiffs allege that their procedural due process rights were violated when the ACS and police defendants removed their children without prior court authorization and when the ACS defendants did not give them notice of the April 25th Article 10 hearing. (ECF No. 32 ¶¶ 126, 128, 133-35.) The defendants respond that the children were at risk of imminent harm based on the SCR Report, Ms. Sulaymu-Bey's refusal to admit the ACS defendants, and N.S.B.'s condition—that she was "very small" and "very pale," and could not stand or sit on her own.[11] (ECF No. 36 at 19-20.) Thus, they argue, there was no violation of the plaintiffs' rights.

"[B]efore parents may be deprived of the care, custody, or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order permitting removal—must be accorded to them." *Nicholson v. Scoppetta*, 344 F.3d 154, 171 (2d Cir. 2003) (internal quotation marks omitted). However, "a child may be taken into custody by a responsible State official without court authorization or parental consent" in "emergency circumstances." *Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir. 1999). In emergency removal cases, "parents must be provided with a prompt post-deprivation hearing." *Hollenbeck v. Boivert*, 330 F. Supp. 2d 324, 332 (S.D.N.Y. 2004) (quoting *Tenenbaum*, 193 F.3d at 594). "If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent." *Southerland*, 680 F.3d at 149 (quoting *Nicholson*, 344 F.3d at 171). "[R]emoval without a court order under § 1024 [of the Family Court Act] is only available in the most exigent of circumstances." *Villanueva*, 2010 WL 1654162, at *1.

---

[11] At this stage in the proceeding, I do not consider defendant Williams' Family Court testimony about her observations of N.S.B. for its truth. *See supra* at 6-7.

"To show that emergency circumstances existed, the government must offer objectively reasonable evidence that harm was imminent." *Southerland*, 680 F.3d at 149 (internal quotation marks and alterations omitted.) Although the Second Circuit "has not attempted to set forth exhaustively the types of factual circumstances that constitute imminent danger justifying emergency removal," it has "concluded that these circumstances include . . . the risk that children will be left bereft of care and supervision, and immediate threats to the safety of the child." *Id.* (internal quotation marks and alterations omitted).

### a. ACS's Removal of the Children

The plaintiffs state a procedural due process claim with respect to ACS's removal of their children. It is undisputed that the children were removed without prior court authorization or parental consent. At this stage in the proceeding, the plaintiffs' allegation—that there was no emergency that warranted the children's removal without a court order—is sufficient. The complaint alleges that while Dr. Michel told Ms. Sulaymu-Bey that N.S.B. was underweight, she did not prescribe any treatment, and scheduled a follow-up examination six weeks later. After Dr. Michel filed an SCR report, the ACS defendants and police defendants went to the plaintiffs' home the next day. Although the plaintiffs initially refused to open the door, Ms. Sulaymu-Bey told the defendants that her children had just seen the doctor, and were scheduled for a follow-up appointment in six weeks. Under these circumstances, and at this early stage of the proceedings, the plaintiffs state a claim that the children were not in imminent danger, and there was "reasonably sufficient time to seek prior judicial authorization." *See Southerland*, 680 F.3d at 149 (quoting *Nicholson*, 344 F.3d at 171). Thus, the plaintiffs sufficiently state a claim for procedural due process.

### b. Notice of April 25, 2014 Hearing

The plaintiffs fail to state a procedural due process claim with respect to defendants' failure to give them notice of the April 25th Article 10 hearing. The Second Circuit "has held that court orders of temporary removal may constitutionally be sought '*ex parte* or otherwise,' and as a result, did 'not hold, expressly or implicitly . . . that notice to parent or guardian is constitutionally required." *Villanueva*, 2010 WL 1654162, at *8 (alteration in original) (quoting *Tenenbaum*, 193 F.3d at 594 n. 10.) Thus, the defendants' failure to provide the plaintiffs with notice of the April 25th hearing did not violate the plaintiffs' procedural due process rights.[12]

### 2. Substantive Due Process

The plaintiffs assert substantive due process claims based on the removal of their children without prior court authorization and the failure to give them notice of the April 25th Family Court hearing. (*See* ECF No. 32 ¶¶ 119-49.)

Parents and children have "a substantive right under the Due Process Clause to remain together without the coercive interference of the awesome power of the state." *Tenenbaum*, 193 F.3d at 600 (internal quotation marks omitted). To state a substantive due process claim, the plaintiffs must plausibly allege that the removal of their children "would have been prohibited by the Constitution even had the parents been given all the procedural protections to which they were entitled." *Southerland*, 680 F.3d at 142 (internal quotation marks and alterations omitted). That burden is met where the facts show that "the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Id.* at 151 (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009)).

---

[12] The plaintiffs also assert a procedural due process claim against defendant City of New York for failing to initiate a hearing within four days of their children's removal, but the Family Court, not the defendant, set the permanency hearing date. (*See* ECF No. 32 ¶ 139; ECF No. 35-5 at 7.)

Brief removals of a child "generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal.'" *Southerland*, 680 F.3d at 153 (quoting *Nicholson*, 344 F.3d at 172). Once such "court confirmation of the basis for removal is obtained, any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." *Id.* (internal quotation marks and citation omitted).

### a. ACS's Removal of the Children

The plaintiffs fail to state a substantive due process claim with respect to their children's removal. After the plaintiffs' children were removed on April 25, 2014, the Family Court held a hearing the same day and confirmed the basis of removal. Thus, the plaintiffs' claim for a substantive due process violation for their children's removal must fail. *See, e.g., Schweitzer v. Crofton*, 935 F. Supp. 2d 527, 549 (E.D.N.Y. 2013) (no substantive due process violation where defendants filed neglect petition three days after removal, and post-removal judicial hearing was held three days later); *E.D. ex rel. V.D. v. Tuffarelli*, 692 F.Supp.2d 347, 368 (S.D.N.Y. 2010) (no substantive due process violation where judicial proceedings began Monday after children were removed Friday evening).

### b. Notice of April 25, 2014 Hearing

The plaintiffs' substantive due process claim about the lack of notice fails for the same reason that their procedural due process claim failed.

**B.    Search and Seizure and Invasion of Privacy Claims (Fourth Amendment and New York Constitution Article 1, Section 12)**

The plaintiffs claim that the defendants violated the Fourth Amendment by entering and searching their home.[13] (ECF No. 32 ¶¶ 150-54.)

"The Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation." *Nicholson*, 344 F.3d at 172 (internal quotation marks and alterations omitted). In the Fourth Amendment context, "a warrantless arrest can usually be justified by the existence of probable cause to arrest arising at the time of the arresting officer's action." *Id.* However, "if New York law does not authorize the removals the plaintiffs complain of, there can be no probable cause to carry out the removal." *Id.* at 176. "The test is similar to the procedural due process standard." *Shapiro v. Kronfeld*, No. 00-CV-6286, 2004 WL 2698889, at *17 (S.D.N.Y. Nov. 24, 2004).

Because the plaintiffs sufficiently state a procedural due process claim, including that emergency circumstances did not exist for the defendants to remove their children, the plaintiffs sufficiently allege that there was no probable cause to justify defendants' entry and search of the plaintiffs' house without prior court authorization. *See Nicholson*, 344 F.3d at 172, 176. Thus, at this stage, the plaintiffs sufficiently state a Fourth Amendment claim.[14]

---

[13] The plaintiffs also assert a Fourth Amendment claim on their children's behalf for their removal without a warrant or court order. However, as discussed above, the *pro se* plaintiffs may not assert claims on their children's behalf. *See infra* at 8 n.9 (citing *Cheung*, 906 F.2d at 61). In addition, any Fourth Amendment claim arising from the removal of the children is dismissed because "[a] Fourth Amendment child-seizure claim belongs only to the child, not to the parent . . . ." *Southerland*, 680 F.3d at 143.

[14] Because the plaintiffs state a claim under the Fourth Amendment, the plaintiffs' claim for the same conduct under the New York Constitution is dismissed. *Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (affirming district court's dismissal of New York state constitutional claims "[b]ecause alternative remedies were available under § 1983"). In any case, the plaintiffs' New York state law claims are barred by the applicable statute of limitations. *See infra* at 22; N.Y. Gen. Mun. Law § 50-i(c).

## C.    Slavery, Peonage, and Trafficking Claims

The plaintiffs claim that the defendants violated the Thirteenth Amendment by unlawfully removing their children. (ECF No. 32 ¶¶ 212-21.) They allege that defendant City of New York employs a policy and custom of removal targeting families it "perceives as black or latino." (ECF No. 32 ¶¶ 215-21.)

The Thirteenth Amendment provides that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. To state a claim under the Thirteenth Amendment, plaintiffs must demonstrate that they have been subjected to "compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." *Ford v. Nassau Cty. Exec.*, 41 F. Supp. 2d 392, 400–01 (E.D.N.Y. 1999) (internal quotation marks omitted). "Under 18 U.S.C. § 1595, an individual who is the victim of peonage, enticement into slavery, or forced labor 'may bring a civil action against the perpetrator . . . .'" *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 327 (E.D.N.Y. 2014) (quoting 18 U.S.C. § 1595(a)).

The plaintiffs fail to state a claim under the Thirteenth Amendment and § 1595 because they do not allege that they were subjected to slavery, involuntary servitude, or any type of compulsory labor. The plaintiffs do not allege that the defendants required them or their children to perform any work.[15] The defendants' actions at issue in this case—filing an SCR report and removing the children—are not actionable under the Thirteenth Amendment or § 1595.

---

[15] As discussed above, any claims asserted by the *pro se* plaintiffs on their children's behalf are dismissed. *See infra* at 8 n.9 (citing *Cheung*, 906 F.2d at 61).

14

**D.      Retaliation and Religious Exercise Claims (First Amendment, RFRA, RLUIPA)[16]**

**1.      Retaliation**

The plaintiffs claim that the defendants removed their children in retaliation for their complaints about ACS's policies, and their statements about their nationality and religion.  (ECF No. 32 ¶ 189-95.)

In order to establish a First Amendment retaliation claim, the plaintiffs must plausibly allege that (1) the speech or conduct was protected by the First Amendment, and (2) the defendants took an adverse action against them that had a causal connection to the protected speech.  *Mortimer v. City of New York*, No. 15-CV-7186, 2018 WL 1605982, at *24 (S.D.N.Y. Mar. 29, 2018).  If plaintiffs make a prima facie showing of retaliatory harm, "the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ."  *Graham v. City of New York*, 869 F. Supp. 2d 337, 352 (E.D.N.Y. 2012) (quoting *Hartman v. Moore*, 547 U.S. 250, 260 (2006)).

Accepting the plaintiffs' allegations as true and drawing all reasonable inferences in their favor, as I must, I find that the plaintiffs have sufficiently stated a First Amendment retaliation claim.  The plaintiffs allege that they sent letters to defendants City of New York, Kathy Ann Best, and Gladys Carrion in which they complained about ACS's policies regarding educational neglect petitions, and "detail[ed] the rights and national standing," presumably a reference to the plaintiffs' religious beliefs.  The plaintiffs allege that ACS's decision to remove their children was connected to their protected expression of their views.  At this early stage, the plaintiffs have sufficiently pled a First Amendment retaliation claim.

---

[16] The plaintiffs' RFRA claim is dismissed because they do not allege any federal government action. *Tanvir v. Tanzin*, 915 F.3d 898, 901 (2d Cir. 2019) ("RFRA applies to the federal government.")

## 2. Free Exercise Clause[17]

The plaintiffs appear to claim that the defendants violated their right to free exercise of religion under the First Amendment. (*See* ECF No. 32 ¶ 187, 196, 247-51.)

The First Amendment's Free Exercise Clause "prohibits the government from enacting a law or regulation that discriminates against religious beliefs or regulates conduct because it is undertaken for religious reasons." *People United for Children, Inc. v. City of New York*, 108 F. Supp. 2d 275, 298 (S.D.N.Y. 2000) (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)). A law or regulation is invalid if it facially targets religion unless "it is justified by a compelling governmental interest and is narrowly tailored to advance that interest." *Id.* However, a neutral law or regulation of general applicability "is constitutional even if it has an incidental effect on religion." *Id.* (citing *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). Even so, the Free Exercise Clause "'forbids subtle departures from neutrality,' and 'covert suppression of particular religious beliefs.'" *Id.* (quoting *Hialeah*, 508 U.S. at 534). In order to state a Free Exercise Clause claim, the plaintiffs must show that "their religious beliefs are sincerely held, that the [c]hallenged [l]aws burden Plaintiffs' religious practice, and that the [c]hallenged [l]aws were enacted to infringe upon or restrict religious practices because of their religious motivation." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 484 (S.D.N.Y. 2017).

The plaintiffs fail to state a claim under the Free Exercise Clause. The plaintiffs allege no facts to support their claim that the legislature enacted the Family Court Act to infringe upon

---

[17] To the extent the plaintiffs bring their free exercise claim under Article 1, Section 3 of the New York Constitution, the claim is barred by the relevant statute of limitations. *See infra* at 22; N.Y. Gen. Mun. Law § 50-i(c).

or restrict religious practices. The plaintiffs allege that defendants' actions burdened their religious practice, but that is not sufficient to state a Free Exercise Clause claim.

### 3. Religious Land Use and Institutionalized Persons Act (RLUIPA)

The plaintiffs similarly fail to state an RLUIPA claim. RLUIPA prohibits the government from imposing a "substantial burden on the religious exercise of a person residing in or confined to an institution . . . ." *See* 42 U.S.C. § 2000cc(a). The plaintiffs do not allege any facts showing that they were confined in an institution. Thus, the plaintiffs do not allege sufficient facts to support their claim that their religious exercise was substantially burdened while they were confined to an institution, so the RLUIPA claim is dismissed.

### E. Conspiracy Claims

The plaintiffs claim that defendants Cato, Best, Williams, Dawson, and Dr. Michel conspired to remove their children unlawfully, to deprive the plaintiffs of the opportunity to appear in Family Court, and to lie to the Family Court judge about the timing of the police officers' arrival at the plaintiffs' home and whether the plaintiffs could get a second medical opinion on the health of their oldest and youngest daughters. (ECF No. 32 ¶¶ 254-55; *see also* ECF No. 32 ¶¶ 197-204.)

To state a § 1983 conspiracy claim, a plaintiff must allege facts showing (i) an agreement between two or more state actors or between a state actor and a private entity (ii) to act in concert to inflict an unconstitutional injury, and (iii) an overt act done in furtherance of that goal causing damages. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002). Conspiracy claims are "so easily made and can precipitate such protracted proceedings with such disruption of governmental functions" that detailed fact pleading is required. *Bender v. City of New York*, No. 09-CV-3286, 2011 WL 4344203, at *1 (S.D.N.Y. Sept. 14, 2011) (quoting *Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir. 1981)). "[A]ssertions lack[ing] any factual

foundation . . . are merely conclusory allegations" and are insufficient to state a claim. *Jackson v. County of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011) (summary order).

To state a § 1985(3) conspiracy claim, a plaintiff must allege "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Porter v. City of New York, et al.*, No. 03-CV-6463, 2004 WL 7332338, at *5 (E.D.N.Y. Mar. 15, 2004) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)). For the conspiracy element, plaintiffs "must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Id.* (internal quotation marks and citations omitted). A § 1985 conspiracy claim also requires that plaintiffs allege "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004) (quoting *Thomas*, 165 F.3d at 146); *see also Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights must be dismissed." *Porter*, 2004 WL 7332338, at *5 (internal quotation marks omitted).

The plaintiffs' conspiracy claims fail because they do not allege detailed facts or provide any factual basis that the defendants agreed to deprive the plaintiffs of their rights or to commit an unconstitutional injury. The plaintiffs allege only that the defendants "conspired by concerted action" to take the actions they did. That conclusory allegation is not sufficient to state a § 1983 or § 1985 conspiracy claim.

**F.     Municipal Liability (*Monell*)[18]**

**1.     Custom or Policy**

The plaintiffs allege that defendant City of New York is liable for § 1983 violations because of its customs and policies, including a custom of ignoring exculpatory evidence in its investigations and prosecutions, and a policy and practice of using "boilerplate forms as [a] basis for seizure and prosecution of Plaintiffs," allowing ACS employees to substitute their judgment for doctors' opinions, and failing to give notice of Family Court hearings. (ECF No. 32 ¶¶ 123, 126, 131, 235.)

To establish municipal liability for a § 1983 claim, "a plaintiff must demonstrate both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." *Hartline v. Gallo*, 546 F.3d 95, 103 (2d Cir. 2008) (internal quotation marks omitted).

The plaintiffs do not allege sufficient facts about an official policy or custom. Rather, they make conclusory allegations about the defendant City of New York's "custom" and "policy and practice;" "[c]onclusory allegations of this type do not provide a basis for municipal liability under *Monell*." *Mortimer*, 2018 WL 1605982, at *28. The plaintiffs' *Monell* claim is also premised primarily on the violation of their own rights in this case, which is insufficient to state a claim for municipal liability. *See DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single

---

[18] Defendant Kings County Hospital is dismissed from this suit because it is not a suable entity. *See Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 716 (E.D.N.Y. 2015) (dismissing Elmhurst Hospital, an operating division of Health and Hospitals Corporation, because it "is not a suable entity"); *Walton v. Rubel*, No. 16-CV-1989, 2018 WL 3369664, at *2 (E.D.N.Y. July 10, 2018) ("Kings County Hospital is operated by the Health and Hospitals Corporation of the City of New York.") Under the New York City Charter, actions must be brought in the name of the City of New York unless "otherwise provided by law." N.Y. City Charter Ch. 17, § 396. Although Health and Hospitals Corporation has the capacity to be sued by statute, Kings County Hospital does not. *Cf. Ayala v. Bellevue Hosp.*, No. 94-CV-1551, 1999 WL 637235, at *3 (S.D.N.Y. Aug. 20, 1999) (citing N.Y. Unconsol. Laws § 7385(1) (McKinney 1979)).

incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."); *Anderson v. City of New York*, 657 F. Supp. 1571, 1574 (S.D.N.Y. 1987) ("Plaintiff cannot infer a policy from the alleged violation of his own civil rights.").[19]

## 2.    Failure to Train or Supervise

The plaintiffs allege that defendant City of New York failed to train or supervise its employees on "on constitutional procedural and substantive protections and rights under the constitution," and on the "lawful use of past information later found to be unsubstantiated in a manner that safeguards the rights of plaintiffs." (ECF No. 32 ¶ 235; *see also* ECF No. 32 ¶ 160.)

"To state a claim for municipal liability on a failure to train theory, a plaintiff must allege an underlying constitutional violation that was occasioned by a municipality's failure to train its employees and, further, that the failure to train amounted to deliberate indifference." *Mortimer*, 2018 WL 1605982, at *29. Deliberate indifference is established where

> [i] a policymaker knows to a moral certainty that city employees will confront a
> particular situation; [ii] the situation either presents the employee with a difficult choice
> of the sort that training or supervision will make less difficult or there is a history of
> employees mishandling the situation; and [iii] the wrong choice by the city employee will
> frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 195-96. Plaintiffs must establish "[a] pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* at 61.

---

[19] The plaintiffs attach to their complaint an article about a case in which the New York Supreme Court reversed a Family Court order granting ACS's neglect petition for the infant child of a 19-year-old mother; ACS relied on past reports of the mother's arguments with her mother and grandmother. (ECF No. 32 at 48.) It does not appear that the case had anything to do with the defendants' alleged policies and practices, or that the case is similar to this case.

The plaintiffs' allegations that defendant City of New York failed to train or supervise its employees are completely conclusory, and thus are not sufficient to support a claim for municipal liability. Moreover, the plaintiffs' *Monell* claim is premised primarily on the one incident at the heart of this case, which does not give rise to municipal liability for failure to train. *Mortimer*, 2018 WL 1605982, at *29 ("A single violation does not give rise to municipal liability for failure to train.").

### G.    Defendants Gladys Carrion and Sasha Dawson

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("Supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." (internal quotation marks and alterations omitted)).

I agree with defendants Carrion and Dawson that the plaintiffs do not allege sufficient facts to state a constitutional violation claim against either defendant. The plaintiffs allege that defendant Carrion received correspondence from the plaintiffs and did not answer, and that defendant Dawson told the plaintiffs when the post-deprivation Family Court hearing would be, and spoke with the defendant police officers when the children were removed. These allegations are not sufficient to subject defendants Carrion and Dawson to § 1983 liability, and the case against them is dismissed.

### H.    State Law and "Medical Fraud" Claims

The plaintiffs claim that the defendants violated a number of New York state laws, asserting claims for negligent hiring and retention, negligence per se, tortious interference with birthright, and negligent infliction of emotional distress. (ECF No. 32 ¶¶ 236-38, 240-46, 268-

72, 280-90.) The plaintiffs also claim that Dr. Michel engaged in "medical fraud" during her medical examination of B.A.S., which I construe as a claim for either common law fraud or medical malpractice under New York state law. (ECF No. 32 ¶¶ 273-79.)

The plaintiffs' New York state law claims are barred by the statute of limitations. *Felmine v. City of New York*, No. 09-CV-3768, 2011 WL 4543268, at *24 (E.D.N.Y. Sept. 29, 2011) ("In New York, the statute of limitations for tort actions against the city or its employees is one year and ninety days." (citing N.Y. Gen. Mun. L. § 50–i, k)). The plaintiff filed the complaint on April 21, 2017, three years after Dr. Michel's medical examination and ACS's removal of the children. Thus, the plaintiffs' state law claims against the defendants, who include the City of New York and its employees, are untimely.

## I. Qualified Immunity

The individual defendants assert that they are entitled to qualified immunity. (ECF No. 36 at 32-34.) "A government actor performing a discretionary task is entitled to immunity from § 1983 suits if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Hollenbeck*, 330 F. Supp. 2d at 334 (quoting *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 250 (2d Cir. 2001)).

A determination on the question of qualified immunity at this stage in the proceeding is premature. *Hollenbeck*, 330 F. Supp. 2d at 335 (S.D.N.Y. 2004) (noting defendants' concession that "it is an unusual case where the question of qualified immunity can be resolved on a motion to dismiss"). Accordingly, the defendants' motion for judgment on the pleadings on the basis of qualified immunity is denied without prejudice.

### J.    Rooker/Feldman Doctrine

The defendants argue that the Rooker/Feldman doctrine precludes the Court from hearing

any claims that challenge the Family Court's findings and orders. (ECF No. 48 at 7-8.)

Specifically, they argue that Judge Mulroy found that the plaintiffs' children "were in imminent

risk, that ACS had made reasonable efforts to avoid recourse to removal, and that removal was

necessary." (ECF No. 48 at 8.)

"Underlying the *Rooker–Feldman* doctrine is the principle, expressed by Congress in 28

U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-

court decisions." *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005).

According to the Second Circuit, the following four threshold factors must be established in

order for the *Rooker–Feldman* bar to apply:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must
> complain of injuries caused by a state-court judgment. Third, the plaintiff must invite
> district court review and rejection of that judgment. Fourth, the state-court judgment
> must have been rendered before the district court proceedings commenced—*i.e.*, *Rooker–
> Feldman* has no application to federal-court suits proceeding in parallel with ongoing
> state-court litigation.

*Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (alterations omitted) (quoting *Hoblock,* 422

F.3d at 85).

The defendants' argument fails because the plaintiffs are not "state-court losers." The

Family Court ultimately returned all four of the plaintiffs' children to the plaintiffs' custody. *See*

*Villanueva*, 2010 WL 1654162, at *7 ("Plaintiff's child had already been returned before the

federal court action was filed, so he plainly has not repaired to federal court to undo the

Family Court judgment." (internal quotation marks and alterations omitted)). In other words,

"[t]his is not the type of situation . . . where a child is permanently removed from custody and the

23

parent seeks the child's return," which would implicate *Rooker–Feldman*. *Tuffarelli*, 692 F. Supp. 2d at 358.

To the extent the defendants argue that the plaintiffs "should be issue precluded from litigating claims that were decided by the Family Court's orders," (ECF No. 48 at 5 n.3), the plaintiffs did not have a full and fair opportunity to litigate Judge Mulroy's imminent risk finding because the April 25, 2014 hearing was conducted *ex parte*. *See Shapiro*, 2004 WL 2698889, at *10 (collateral estoppel bars claims if "the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding"). Moreover, Judge Turbow's later orders on October 10, 2014, finding no neglect for the older three children and neglect for N.S.B. are not implicated in the plaintiffs' claims in this suit. *See id.* (collateral estoppel bars claims if "'the issue in question was actually and necessarily decided in a prior proceeding'" (quoting *Colon*, 58 F.3d at 869). As the defendants acknowledge, "the issues of imminent danger, reasonable basis and exigent circumstances were not necessary to Judge Turbow's decision whether or not Ms. Sulaymu-Bey neglected her children." (ECF No. 48 at 10.)

## II.    Plaintiffs' Motion for Judgment on the Pleadings

In a purported motion for judgment on the pleadings, the plaintiffs argue that collateral estoppel prevents the defendants from asserting that emergency circumstances existed at the time of ACS's seizure of their children. (ECF No. 42 at 12-18.) They argue that the Family Court's findings of fact included a determination that no emergency circumstances existed that warranted the police entering their home without a court order and seizing their children. (*Id.* at 12-13.)

"Under New York law, collateral estoppel or issue preclusion will bar claims if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Shapiro*, 2004 WL 2698889, at *10 (internal quotation marks omitted).

As discussed above, the issues at stake in this litigation—including whether emergency circumstances existed at the time of the children's removal—were not necessary to Judge Turbow's findings in his October 10, 2014 orders. Accordingly, the plaintiffs' motion for judgment on the pleadings is denied.

## CONCLUSION

The defendants' motion for judgment on the pleadings is granted in part and denied in part in accordance with the reasons set forth in this opinion. The plaintiffs' motion for judgment on the pleadings is denied.

**SO ORDERED.**

s/Ann M. Donnelly
_____

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
     March 29, 2019